BENJAMIN HANEY AND CHARLES SCATTERGOOD, PLAIN-
TIFFS IN ERROR, v. GILBERT COMPTON, DEFENDANT
IN ERROR.

1. The seventh section of the act, "for the preservation of clams and
oysters," (*Nix. Dig.* 131,)* which prohibits the raking or gathering of
oysters in any of the waters of this state by any person, who is not at
the time and has not been for six months then next preceding, an
actual inhabitant and resident of this state, makes no distinction be-
tween natural and planted oysters.

2. A statute which simply prohibits non-residents on board a vessel from
subverting the soil of the state and carrying away her property and
that of her grantees, leaving such vessel free to pass and repass, and go
whithersoever those in charge of her desire, is not a regulation of com-
merce with foreign nations or among the states.

3. Such a statute is for the protection of property, and is at most an in-
ternal police regulation entirely within the competency of the state to
adopt.

4. A statute of this state prohibiting citizens of another state from coming
upon the lands under water belonging to the state, and subverting the
soil and interfering with the property there found, is not a violation of
that clause of the constitution of the United States which ordains that
the citizens of each state shall be entitled to all the privileges and
immunities of citizens in the several states.

5. When the proceeding is *in rem* against property in a foreign jurisdic-
tion, found in the possession of the owner or his agent, and in use for
an unlawful purpose which carries a forfeiture of the same, the seizure
thereof without judicial process first issued, preparatory to regular
trial and condemnation, is not a deprivation of property without due
process of law.

In error to the Cumberland Circuit.

The suit below was in *replevin.*

The plaintiffs, in their declaration, charge the defendant
with taking their schooner, the Rhoda L. Loper, in the waters
of Maurice River Cove, in the township of Maurice River,
in the county of Cumberland, in this state, with her sails,
anchors and appurtenances.

* *Rev., p.* 134.

To this declaration the defendant filed avowries, in which he admits the taking, and justifies it under the seventh section of the act respecting clams and oysters, (*Nix. Dig.* 130,) by averring that, on the day of the taking, one John Barret, who was not then, and had not been for six months next preceding, an actual inhabitant and resident of this state, was on board of said schooner, and in the use and employment of her for that purpose, raking and gathering oysters, in the said place in which, &c., on his own account and benefit, and on the account and benefit of his employers; and that the defendant, for this reason, seized said schooner, and gave immediate information to two justices of the peace, &c., as required by the act, and for such cause had the schooner in his possession at the time of the replevying of her by the plaintiffs, and therefore prayed her return.

To these avowries of the defendant, the plaintiffs filed two pleas in bar, in which they do not traverse any fact alleged in the avowries, but aver that the said oysters which the said John Barret was raking and gathering were oysters which had been planted where there was no natural growth of oysters, by one John Haley, and by him sold to one Charles Ogden, by whom they had been sold to the plaintiffs, at whose request the said John Barret was gathering them; and that the schooner, when seized, had a coasting license from the government of the United States.

To these pleas of the plaintiffs, the defendant filed a demurrer, and after argument, judgment was given for the defendant.

The following reasons were assigned for the judgment by VAN SYCKEL, JUDGE.

"This suit is brought to recover possession of the schooner Rhoda L. Loper, seized by the defendant for an alleged violation of the seventh section of the oyster law, in Maurice River Cove, in the county of Cumberland, on the 7th day of June, 1869.

"The defendant avows the taking, because he says that one John Barret was on board of said schooner, and in the use

and employment of her for that purpose, raking and gathering oysters on his own account and benefit, and on the account and benefit of his employer; and that the said John Barret was not, on said day, and had not been for six months next preceding said day, an actual inhabitant and resident of the State of New Jersey. The plaintiffs pleaded to this avowry, admitting the facts stated, and setting up, in avoidance, that at the time of such taking, the said vessel was engaged in raking oysters planted by a citizen of New Jersey, who, before that time, had sold them to the plaintiffs, and that such oysters were planted where there was no natural growth of oysters.

" Upon demurrer interposed by the defendant to this plea, two questions were started :

" *First.* Whether the seventh section of the oyster law interdicts the taking of planted oysters.

" *Second.* If so, whether the section is constitutional.

" Further consideration has confirmed my views expressed in a former opinion, upon the first point, which will now be repeated. The oyster act, as originally passed March 27th, 1719 (*Nevill* 86), prohibited, by its first section, any person whatsoever, from taking oysters between May 10th and September 1st, and by its second section, forbid any person not residing in this province, from taking oysters and putting them on board a vessel not wholly owned by a resident. At the time this act was passed, the business of planting oysters was unknown, but came into use prior to the revision of the laws in 1820, at which date, the proviso in section one, ' that nothing in that section shall apply to planted oysters,' first appears. That the first section, revised in 1820, without the proviso, would have applied to both natural and planted oysters, cannot be questioned, if the language is given its usual significance, and that it was so understood at that day, is evinced by the fact that it was deemed necessary to add that proviso to the first section, to save planted oysters from its operation. The seventh section of the present act was substantially enacted at the same time with section one, and run parallel with it, and before the revision in 1820, the two sec-

tions were co-extensive, and applied to the same class of oysters.

"The fact, therefore, that in the revision in 1820, section one was adopted with the proviso, saving planted oysters, and section seven without such proviso, shows indubitably, that it was intended that the latter section should apply to all oysters, whether natural or planted; otherwise, the proviso incorporated in section first was entirely unnecessary, and that section would, without the added words, apply only to natural oysters. There is no rule of statutory construction which will permit language so comprehensive to be so restricted in its application. The seventh section must be held to exclude non-residents from taking planted oysters in our waters. Is this act so interpreted, in conflict with any provision of the federal constitution? The inhibition relied upon is found in the following citations:

"1. The second section of article fourth: 'The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.' 2. The third clause of section eighth, article first: 'That congress shall have power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes.' Both these provisions were elaborately discussed by Judge Bushrod Washington, in *Corfield* v. *Coryell*, 4 *Wash. C. C. Rep.* 371, in which he held that it was competent for state legislation to prohibit the taking of natural oysters by non-residents, from beds within its territorial limits. There is no grant of power to the general government, which impairs the right of the states to regulate the use of their public property, provided the free enjoyment of the highways for the purposes of commercial intercourse or inter-state trade is not interfered with.

"The grant of power to congress to regulate commerce on the navigable waters of the state, contains no cession of the *jus privatum* which the state has in the soil covered by its waters. The section in question does not restrain the free use of our waters for the purposes of trade and intercourse, and is therefore not a regulation of commerce: nor is this sec-

tion obnoxious to the charge, that it attempts to restrict the carrying of articles of trade to a class of vessels. All persons and all vessels may legitimately engage in the business of carrying oysters after they have been gathered and become an article of merchandise. There is no encroachment in this legislation, upon the exclusive jurisdiction of the national legislature over the subject of commerce. But the plaintiffs rely chiefly upon that clause of the constitution which declares that, 'the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states.'

"Judge Washington limits this expression to those privileges and immunities which are in their nature fundamental, and belong of right to the citizens of all free governments, such as protection by the government, the enjoyment of life and liberty, the right to buy, hold and dispose of property, to pass through and reside in the state, and to be exempt from impositions higher than those paid by other citizens of the state. This view is accepted by Chancellor Kent, in Vol. 2 of his Commentaries, page 71. Among these fundamental rights cannot be included the right to participate in the enjoyment of the private property of the state. The soil of Maurice river cove, and the oysters upon it, were the property of the State of New Jersey, and even one of her own citizens could not plant upon or take oysters from it without her consent. No citizen of the United States has a right to engage in the employment of taking the private property of the state, or of an individual, without the consent of the state or the individual owner. The full ownership of this species of property empowers the state to declare who shall take it, upon what terms it shall be taken, and by what means it shall be removed. A citizen of Pennsylvania cannot claim a right to acquire the property of New Jersey in a manner different from that in which New Jersey agrees to dispose of it, nor can he successfully assert a right to be employed on a vessel to take private property without the consent of the owner, or to take it contrary to the condition upon which the vendor of his employer holds it. His un-

questionable right to employment upon all vessels at the option of the employer, for all lawful purposes, cannot be the foundation of a claim to be employed for an unlawful purpose.

"The law-making power has given to all the residents of this state the right to go upon her private property in a specified manner and take oysters; this privilege might, lawfully, have been even made, circumscribed by limiting it to a portion of such inhabitants, to the exclusion of others. The persons from whom the plaintiffs purchased the planted oysters, although residents in this state, were interdicted by the statute from taking them with a vessel having on board a non-resident, and therefore the plaintiffs, who are non-residents, are now claiming rights superior to those enjoyed by the inhabitants of the state.

"The state having title to the soil of the cove, might claim absolute property in all oysters planted upon it, regarding the return of such oysters to their natural element by a mere trespasser, as an abandonment by the former owner. Her own residents are, by favor, permitted to plant and take them, and to acquire a property in them, subject to certain prescribed conditions, which the law maker has deemed essential to prevent spoliation of the beds. The condition imposed is, that they shall be taken from the beds by New Jersey crews, and this limitation will apply to the same, and no greater extent, when a resident of Pennsylvania acquires, by purchase or otherwise, the right of property which a resident of New Jersey may have in oysters lying in the beds of our waters. The latter cannot pass to the former a title better than he himself has.

"The conclusion is, that the validity of the state law is unshaken, and there must be judgment for the defendant, with costs."

A writ of error was brought to remove the judgment and proceedings to this court.

For plaintiffs in error, *Mitchell* and *P. L. Voorhees.*

1. The seventh, ninth and tenth sections of the act entitled "An act for the preservation of clams and oysters," approved April 14th, 1846, under which the defendant seeks to justify, apply only to oysters growing on natural banks or beds, and not to oysters planted and growing where natural oysters do not grow.

2. The act under which the defendant seeks to justify is contrary to sections 6, 7, and 8 of article I of the constitution of New Jersey, and to section 8 of Article I, section 2 of Article IV of the constitution of the United States, and to sections 4, 5, and 14 of the amendments of the constitution of the United States, and is unconstitutional and void.

For defendant in error, *F. F. Westcott* and *F. T. Frelinghuysen.*

The determination of this controversy involves the consideration of the terms of the seventh section of the "Act for the preservation of clams and oysters." *Nix. Dig.* 131.

The defendant having pleaded the act as his defence, the plaintiffs, at the argument below, endeavored to avoid it upon two grounds:

(1.) Upon the ground that it was repugnant to the constitution of the United States.

(2.) Upon the ground that, if constitutional, it was not intended to inhibit the gathering of planted oysters, but only those of natural growth.

I. As to the question of the constitutionality of our act.

The plaintiffs claim that the act is repugnant to the federal constitution in two particulars:

(*a.*) To the third clause of section 8, article 1:

"Congress shall have power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

It was, of course, with a view of claiming the protection of this clause, that the plaintiffs pleaded that their vessel, at

the time of her seizure, had a coasting license from the United States government.

This precise defence, in an analogous case of a seizure of a vessel for an infraction of a similar oyster law of the State of Maryland, was pronounced untenable by the Supreme Court of the United States in the case of *Smith* v. *The State of Maryland*, 18 *How.* 71.

And also in the case of a seizure *under our own act, in the very same Maurice river cove,* by the Circuit Court of the United States for the district of Pennsylvania and New Jersey. *Corfield* v. *Coryell,* 4 *Wash. C. C. Rep.* 371.

There is nothing in our law to prevent navigation ; nothing which hinders the plaintiffs from passing and repassing whither they will, on the surface of the sea ; it simply prohibits them from unlawfully subverting the soil of the state, many fathoms below. A non-resident has no right to tear up the soil of New Jersey by dredges, without her consent.

That the soil of Maurice river cove is New Jersey soil, is admitted, as we have seen, by the pleadings, and has been so declared by all the decisions of our courts, from the earliest cases to the latest. *Arnold* v. *Mundy,* 1 *Halst.* 1 ; *Gough* v. *Bell,* 3 *Zab.* 624 ; *Stevens* v. *Paterson and Newark R. R.,* 5 *C. E. Green* 126. And also by the Circuit Court of the U. S. for this circuit. *Corfield* v. *Coryell,* 4 *Wash. C. C. Rep.* 371. And also by the Supreme Court of the United States. *Martin* v. *Waddell,* 16 *Peters* 367.

(*b.*) The other clause of the Federal Constitution, to which it was claimed that our act is repugnant, is the 2d section of Article IV.

" The citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states."

It will be observed that this section of the Federal Constitution is only applicable to cases in which the parties, plaintiff and defendant, are residents of different states. The plaintiffs in this case can derive no benefit from this or any other provision of that constitution which aims to secure equal rights to the citizens of the several states, because it does not

appear from the pleadings but that they are residents of New Jersey.

By the settled principles of pleading, any ambiguity in the plaintiffs' pleading will be taken against them. And the court will not travel outside the record to imply any beneficial matter which they might have pleaded. Precisely this principle was declared in *Downham et al.* v. *Alexandria*, 10 *Wall.* 173.

The question properly raised by the pleadings is this:

Can a resident of New Jersey lawfully employ a person who is not at the time an actual inhabitant and resident of this state, and who has not been such actual inhabitant and resident for six months next preceding thereto, to rake and gather oysters in the waters of Maurice river cove, in Cumberland county?

The act above cited expressly declares that it shall not be lawful for such a person to do such an act, " on his own account and benefit, *or on account and benefit of his employer.*"

There is no ambiguity in this language, and a strong argument for the right of our legislature to use it is to be found in the consideration that almost all, if not all, the states that own soil adapted to the growth of oysters, have passed laws for their protection similar to our own, and that no one of these laws, so far as known to the counsel of the defendant, has ever been declared unconstitutional, but, on the contrary, have been declared constitutional by a tribunal of no less authority than the Supreme Court of the United States. *Laws of Maryland*, 1831, *ch.* 249.

The second section of this act is almost identical with the seventh section of our own, and enacts " that it shall not be lawful for any person or persons, who has or have not resided in this state at least twelve months immediately previously thereto, to catch or take any oyster in the said waters, under the penaty of $100, to be recovered from each person so offending."

And the fourth section provides for the forfeiture of the vessel, in case the penalty be not paid.

This law, and a supplement passed in 1833, chapter 254, came up for review before the Supreme Court of the United States, in the case of *Smith* v. *State of Maryland*, 18 *How.* 71, and there held to be constitutional, although the counsel of the plaintiffs ·in error had urged their unconstitutionality for the precise reasons urged below by the counsel of the plaintiffs in error in this cause, against the constitutionality of our own law.

The laws of Virginia contain prohibitions of a similar character.

"If any person other than a citizen of this state shall take oysters or terrapins, or plant oysters in the waters thereof, he shall forfeit $500." *Matthews' Digest of the Laws of Virginia* (*ed. of* 1857,) *Vol. II, p.* 245.

Our own law, like that of Maryland and Virginia, has been for a long time upon the statute book, substantially since 1719, and during this century and a half, though often assailed in the courts, it has never been done successfully, but, as will hereafter be seen, has been fortified by a series of judicial determinations. The right of the legislature to pass it, results directly from the ownership, by the state, of the lands under her waters, (see cases above cited,) and from this ownership a right enures to the legislature either to alien them, by grant, to individuals in fee, (*Gough* v. *Bell*, 1 *Zab.* 156; *State* v. *Common Council of Jersey City*, 1 *Dutcher* 525, or to lease them for a term of years, which is a right that it exercised as anciently as 1824, by passing an act making it lawful for certain persons to use a portion of them *as a planting ground for oysters*, at an annual rent.

See act entitled "An act to encourage and regulate the planting of oysters in the township of Perth Amboy." *Laws of New Jersey*, 1824, *p.* 28.

"The state, as representing the people, has the right to regulate the common rights and privileges of fishing." *Moul-*

*ton* v. *Libbey*, 37 *Maine* 472, 494; *Fuller* v. *Spear*, 16 *Ib.* 417; *Kean* v. *Rice*, 12 *Serg. & R.* 203.

And the state not only has the right to make such regulations and to define the terms upon which her soil may be used for that purpose, but in so doing she is not hampered by any of those restrictions of public policy which may limit the grants of individuals. The state, as *parens patriæ*, is the sole judge of her policy. And in the exercise of her judgment, with a view (1) to save her beds from spoliation, and (2) to preserve for the benefit of her own children the sole use of her soil, not natural beds of the oyster, but adapted to the planting of them, the state imposed the condition upon the use of her lands for the growing of oysters, that when they were lifted thence it should be done by Jersey hands.

From this conclusion it necessarily follows that even if the plaintiffs were citizens of another state, they could not be protected by the section of the federal constitution cited at the head of this sub-title. That section does not give citizens of other states rights *superior* to those of our own citizens.

This is the principle involved in the case, which is the latest on this subject, of *Ward* v. *State of Maryland*, 12 *Wallace* 418. The writ of error in that cause, brought up for examination a statute of Maryland which compelled resident traders to pay a specified tax on sales of personal property, and compelled non-resident traders to pay a much higher tax on sales of the same kind.

Held to be contrary to that section of the federal constitution now under discussion.

The court says:

" This clause secures and protects the right of a citizen of one state to pass into any other state of the Union for the purpose of engaging in lawful commerce, trade, or business, without molestation; to acquire personal property, to take and hold real estate, and to be exempt from any higher taxes or excises than are imposed by the state on its own citizens."

The principle enunciated in Ward v. Maryland is in harmony with the previous declarations of the same court.

*Paul* v. *Virginia*, 8 *Wallace* 168; *Downnam* v. *Alexandria*, 10 *Ib.* 173; *Ducat* v. *Chicago*, *Ib.* 410; *Conner* v. *Elliot*, 18 *How.* 591.

It will be found that in all cases in which state laws have been held to be unconstitutional, as trenching upon the privileges and immunities of the citizens of the several states, that the state legislature has attempted to define the way in which *individuals* may use *their* property—to define the way in which property may be used in which the state has no interest; and not, as in the present case, to define the way in which its own—the state's own—property may be used.

· In concluding this branch of the argument, it will only be necessary to cite the cases confirming, impregnably, the constitutionality of our law. *Corfield* v. *Coryell*, 4 *Wash. C. C. Rep.* 371; *Keene* v. *Rice*, 12 *Sergeant & Rawle* 203.

*John Guyant* v. *Gilbert Compton and Daniel T. Howell.* In 1871, our legislature passed an act supplemental to the act of 1846, and designated to enforce it, by which the defendants above named, (of whom Gilbert Compton is the same Gilbert Compton who defends this suit,) were appointed public officers, and charged with the duty of executing it. To restrain them from so doing, a bill in equity was filed in the United States Circuit Court for this district, in which the complainant, a citizen of Pennsylvania, was represented, with other counsel, by the present Attorney-General of that commonwealth. A rule to show cause why a preliminary injunction should not issue against the defendants was granted by Mr. Justice Strong, of the United States Supreme Court, and the argument on this motion was had before him and Judge Nixon, in the city of Philadelphia, in the summer of 1871. ·The ground on which the injunction was sought, was the unconstitutionality of our laws, and their infringement upon the rights of the citizens of Pennsylvania. The injunction was refused, and the complainant has never taken any further step in the cause.

The constitutionality of our act having been thus affirmed by the state courts both of Pennsylvania and New Jersey, by

the United States Court of this district, and also, substantially, by the United States Court of New York—by all the courts having jurisdiction of the disputed territory—it is thought that the case of the defendant stands on authority, as well as reason, that cannot be questioned.

It is further to be stated, that when the troubles with the citizens of Pennsylvania began, after the enactment of the law of 1871, the mayor of the city of Philadelphia and the Attorney-General of Pennsylvania addressed letters to the governor of this state, pointing out the supposed unconstitutionality of our law of 1846. The governor took the advice of our present Attorney-General, who gave a careful opinion in writing, that the law was constitutional.

II. The other objection urged against our law, by counsel in the court below, was, that its seventh section was only intended to interdict the taking of natural, and not of planted oysters.

It is difficult to see how such an apprehension of the meaning of the language of the section can be reasonably entertained.

The word used is "*oysters;*" the thing forbidden to be taken is "*oysters;*" a word which includes in its meaning all oysters, being a generic term including the two species, natural and planted; these "oysters" are forbidden to be taken "in *any* of the rivers, bays, or waters of this state." Now, it was matter of familiar knowledge to the legislature that there were many of the "rivers, bays, and waters" of this state in which there were no natural oysters at all, but only planted ones, and that in many other of the waters of this state there were both kinds of oysters; but the words used are all comprehensive, embracing both kinds of waters, having neither any excepting clause saving those waters in which only planted oysters were to be found, nor any excepting clause saving planted oysters.

The effect of this reasoning cannot be avoided by averring that the legislature used the generic term unadvisedly. The

act is full of proof that they used the word which they meant, and meant what the word they used would naturally imply.

It is a familiar principle, in the construction of statutes, that other portions of the same act will aid in the interpretation of any particular section.

That the legislature, when they passed this act, were aware of the distinction between natural and planted oysters, is apparent in its very first section.

In the enacting clause of this section, it is declared that no person shall rake, between certain dates, " on any oyster-bed," or gather " any oysters ;" general words are used like those employed in the seventh section. It then occurs to the legislature that the words they have used will prohibit persons who have planted oysters from taking them for their own use, which they do not intend, and so they annex a proviso saving *planted* oysters. The legislature here shows that they knew the distinction between natural and planted oysters, and knew how to use apt words to distinguish them. If, then, when they used the same general term, " oysters," in the enacting clause of the seventh section, they intended to confine its application to *natural* oysters, why did they not here, as in the first section, introduce a limiting proviso?

A reference to other sections of the act will compel this obvious construction.

The fourth section contains matter that is very suggestive. It prohibits the sale of " oysters " between May and September. The word used is the same as that used in the seventh section. The fourth section is intended to protect the public health by prohibiting the sale of oysters at that season of the year when they are unwholesome food ; and in so far as this section of the act is concerned, it is clear that it would be broken by the sale of *planted* oysters, they being just as unwholesome as natural oysters.

The twenty-second section is conclusive.

This makes the taking of " *oysters* " by a non-resident, indictable. It is supplemental to the seventh section, which

is the subject matter of the controversy before the court, by adding an additional penalty to its infraction. The same words, " *oysters, clams and shell-fish,*" are used in both sections. In the twenty-second section, the word " oysters " clearly embraces planted oysters, for, otherwise, the absurd consequences would ensue that it would be indictable to take natural oysters, in which no citizens has invested any labor or money, and not indictable to take planted oysters, in which any citizen may have invested his whole fortune.

The opinion of the court was delivered by

DALRIMPLE, J. This action of replevin was brought for the taking of a schooner, and the furniture and apparel thereof belonging to the plaintiffs. The defendant admits the taking, and justifies the same on the ground, that at the time when the vessel was seized she was in the county of Cumberland, in this state, and had on board a person not an actual inhabitant and resident of this state, who was then and there engaged raking and gathering oysters on his own account, and on account and for the benefit of his employers. The avowries contain the further allegation, that immediately upon the seizure the defendant gave information thereof to two justices of the peace of said county, who appointed a day and place for the hearing and determination of the matter. The allegation of the avowries bring the defendant's defence in terms within the act entitled " An act for the preservation of clams and oysters." *Nix. Dig., p.* 131, §§ 7, 9.* The plaintiffs plead to these avowries, that the vessel when seized was in charge of a certain person who was engaged in gathering oysters in Maurice river cove, within the waters of the State of New Jersey, which oysters were planted and placed there by a citizen and resident of the State of New Jersey, who sold them to a purchaser under whom the plaintiffs claimed the right to take them. The defendant demurs to these pleas, and insists that the act applies as well to planted as natural oysters. This ground of demurrer is well taken. The seventh section of the act which authorizes the seizure makes no

*Rev., p.* 136, §§ 7, 9.

distinction between natural and planted oysters. It pro-
hibits, in general terms, the raking or gathering of oysters in
any of the waters of this state, by any person who is not, at
the time, and has not been for six months then next preceding,
an actual inhabitant and resident of this state. By the first
section of the act, a distinction is made between natural
and planted oysters. By that section, it very clearly appears
that the legislature intended the general term oysters to
include the planted as well as the natural oysters, and we
have no right to restrict the seventh section within limits
more confined, than it is quite clear the law maker intended

The plaintiffs, however, insist that admitting the true con-
struction of the act is as I have stated, it is unconstitutional
and void, because it is a regulation of commerce. It was
doubtless with a view of raising this question, that it was
averred in the pleas that the vessel at the time of her seizure
had a coasting license from the government of the United
States. But it cannot with any propriety be said that a
statute which simply prohibits non-residents on board a vessel
from subverting the soil of the state and carrying away her
property, or that of her *grantees*, leaving such vessel free to
pass and repass, and go whithersoever those in charge of her
desire, is a regulation of commerce with foreign nations, or
among the states. It is a law for the protection of property—
at most an internal police regulation entirely within the com-
petency of the state to adopt, and it is not perceived that it
can by possibility interfere with commerce in the sense in
which that word is used in the federal constitution.

It is insisted in the next place that the statute is a viola-
tion of that clause of the constitution of the United States
which ordains that the citizens of each state shall be entitled
to all the privileges and immunities of citizens in the several
states. That this objection to the act is unfounded, will be
apparent, I think, when we consider what is the right of
which it is said the plaintiffs are deprived. It is of coming
upon the lands under water belonging to the state and sub-
verting the soil and interfering with the property there found.
The lands are those of the state and she may retain them in

her own actual possession, or grant or lease or otherwise part with the possession of them on such terms as she believes sound policy dictates. She hath enacted that a certain class only of her own citizens may gather oysters in the public domain, and restricted the privilege to them. I do not see that the rights thus granted were in any proper sense privileges and immunities of the citizens of this state, or the class of them to which the state gives the right. To so hold would require the state to grant to the citizens of all the other states the right to use the property of the state on the same terms and conditions she is willing to accord such right to her own citizens. In other words, the doctrine sought to be maintained is, that when the state grants to a class of her own citizens the right to use the lands of the state, she must let in the citizens of all the other states on the same terms, and that she cannot constitutionally restrict the right to the people of this state. In my opinion, such a doctrine cannot be maintained on principle or authority. Before leaving this branch of the case it may be well to observe that the act makes no discrimination, except as to the rights conferred between citizens of this state and of another. Both alike are prohibited from taking oysters by the use of any vessel on which is employed a person not a citizen of this state.

It is next objected that the act is unconstitutional, because it deprives the plaintiffs of their property without due process of law. The construction is, that inasmuch as the vessel may be seized without process first issued, and without notice to the owner of the seizure, he may be deprived of his property without opportunity to make defence. It must be recollected that the proceeding is *in rem* against the vessel to declare her forfeited because of a violation of our laws. The act provides that after the seizure, information shall immediately be given to two justices of the peace of the county where such seizure shall have been made, who shall meet at such time and place as they shall appoint, and hear and determine the matter. It is thus shown that the vessel is in the first place to be seized while unlawfully employed within our jurisdiction, and in the next place before condemnation, there is to be a hearing

and determination before a competent tribunal. The proceeding is to be upon due inquiry. Provision is made for hearing the parties, and judgment is to be given only after such hearing. There is to be a regular trial after due appointment of time and place for the same. Any arbitrary, unjust, illegal or oppressive proceeding of the justices, if any such should happen, may be corrected by the Supreme Court by virtue of that general superintending power which it has over all inferior jurisdictions. It appears to me that it would be going too far to hold that such proceeding is void, because no express provision is made for notice to the defendant of the seizure. The seizure of the vessel while in the hands of the owner or his employees is practicably as effective notice that the proceeding has been initiated as could, under the circumstances, be given. The record in this case shows that when the vessel was seized she was in the possession of an employee or agent of the plaintiffs. Without now attempting to define the precise meaning of those much discussed phrases, "due process of law," and "law of the land," it is sufficient to say that when the proceeding is *in rem* against property in a foreign jurisdiction, found in the possession of the owner or his agent, and in use for an unlawful purpose, which causes a forfeiture of the same, the seizure thereof without judicial process first issued, preparatory to regular trial and condemnation, is not a deprivation of property without due process of law.

It is only necessary to say that the plaintiffs' objections that the act is repugnant to the constitution of this state, in that it provides for a criminal prosecution and search and seizure of property without warrant and trial by jury, are not deemed tenable. The proceeding is not a criminal prosecution, nor is it an invasion of the security guaranteed by the constitution of this state, to the people in their homes, persons, papers and effects against unreasonable searches and seizures, nor is the act open to the objection that it violates the right of trial by jury. The case is analogous to that of *McGear et al.* v. *Woodruff*, 4 *Vroom* 213, and must be controlled by the principles in respect to the right of trial by

Haney and Scattergood v. Compton.

jury, adjudicated in that case. In considering the main questions in this case, I have not referred to the adjudged cases which bear upon the points discussed, nor was it necessary. The elaborate brief of the counsel of defendant refers to all the principal authorities, while the subject is exhaustively examined in the opinion of the court below, so far as the points there raised are concerned, and in the case of Bevans v. Compton et al., in the Circuit Court of the U. S. for this district. Judge Nixon, in a clear and well considered opinion, a copy of which was furnished to the court on the argument of this case, taking substantially the same view of the main questions involved as is above indicated.

The result is, that no error having been shown in the record or proceedings below, the judgment must be affirmed, with costs.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, BEDLE, DALRIMPLE, DEPUE, SCUDDER, WOODHULL, CLEMENT, DODD. 9.

*For reversal*—None.

CITED in *Day* v. *Compton*, 8 *Vr.* 514; *Weller* v. *Snover*, 13 *Vr.* 341.