68 N.J. Super. 468 (1961)
172 A.2d 661
STATE BOARD OF MEDICAL EXAMINERS, AND ROSCOE P. KANDLE, STATE COMMISSIONER OF HEALTH, COMPLAINANTS-RESPONDENTS,
v.
ALBERT L. WEINER, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 19, 1961.
Decided July 5, 1961.
*470 Before Judges CONFORD, FREUND and KILKENNY.
Mr. Charles A. Cohen argued the cause for respondent-appellant (Messrs. Plone, Tomar, Parks and Seliger, attorneys; Mr. William Tomar, of counsel; Mr. Cohen, on the brief).
Mr. David D. Furman, Attorney General, argued the cause for complainants-respondents (Mr. Burrell Ives Humphreys, Deputy Attorney General, of counsel and on the brief; Mr. Thomas F. Tansey, Deputy Attorney General, on the brief).
*471 The opinion of the court was delivered by FREUND, J.A.D.
This is an appeal by Albert L. Weiner, pursuant to R.R. 4:88-8, contesting the action of the State Board of Medical Examiners (Board) in temporarily suspending his license to practice medicine and surgery pending the outcome of a manslaughter indictment returned against him by the Grand Jury of Camden County. The appeal presents substantial challenges to the nature and extent of the professed statutory suspension and revocation authority of the Board.
The history of this litigation was developed in part in our decision holding that Dr. Weiner possessed the right to appeal, as from a final order, reported in 67 N.J. Super. 199 (App. Div. 1961), but further exposition is warranted in view of the unusual circumstances surrounding the initial suspension and the later continuation thereof, the latter event comprising the major subject of this appeal.
Following a significant outbreak of alleged serum hepatitis (resulting in nine deaths) among patients treated and administered parenteral injections by Dr. Weiner, the State Commissioner of Health  by notice of October 25, 1960  ordered the osteopath, "in the interest of protection of public health based upon evidence of an unusual incidence of mortality due to an infectious or other toxic agent," to cease "the administration and use of parenteral and other drugs and materials until further notice." Dr. Weiner immediately complied with this order, which, with a slight modification to permit injections of gamma globulin, has remained in effect to the present time.
Shortly thereafter, Dr. Weiner was notified by the Deputy Attorney General, counsel to the State Board of Medical Examiners, to appear before the Board's Committee on Illegal Practice in Princeton, N.J. on November 16, 1960, for the purpose of "inquir[ing] into certain alleged practices in the treatment of certain of your patients." Dr. Weiner appeared at the meeting, a transcript of which is included in the record before us. He was represented by *472 counsel, who were equipped with an investigator and a "medical consultant." Six members of the Committee, ten members of the Board (plus several of their secretaries), and the Board's Chief Administrative Officer were present. The proceeding was conducted by the aforementioned counsel to the Board.
At the outset, Dr. Weiner was informed that any statements made could later be used against him, but was requested to cooperate in a "very informal" proceeding in order that the Board might receive a full picture of the factual details relating to certain known incidents in his recent practice. He was informed that
"* * * at this point, there is no formal charge against you insofar as this Board is concerned. This is merely an inquiry. We're attempting to get from you an explanation of what this is all about, so that the Board can make its own determination, if any future course of action is necessary."
When asked by Dr. Weiner's attorney to identify the statutory basis for the proceeding and to detail any charges contemplated against his client, the Board's counsel referred momentarily to N.J.S.A. 45:9-16, mentioned the possibility of "a criminal charge of homicide," and proclaimed that "if the Board at any time feels that any practitioner licensed by the Board is not practicing in a manner which is consistent with the standards which this Board observes, it can call the license in at any time and suspend and revoke it, if it feels it is in the best interest of the general health and welfare." He then further indicated the Board's position with respect to the proceeding:
"* * * We are extending a courtesy to Doctor Weiner respecting his rights and his position to the Nth degree. * * * You can refuse to answer, you can demand to leave this room and to take your client with you, but I am advising you now that if you take such action Doctor Weiner will leave this room without his license, because there are 13 deaths already involved here. The only thing this Committee wants to know at this time is, what is *473 causing these deaths. We want to get to the bottom of it, and I would appreciate your cooperation and your client's cooperation in telling us his story."
Dr Weiner's recital, interspersed by questions and comments from the Board and Committee members and from counsel, was essentially a summary of the recent events in his practice, his reaction to them, and the preventative measures he had taken. He related that he was licensed to practice in New Jersey and had so practiced since 1943. Since 1955, he had been certified in psychiatry by the American Osteopathic Board of Neuropsychiatrists. His practice was exclusively neuropsychiatric, and he operated mainly on the basis of referrals from other physicians and from several hospitals in New Jersey and Pennsylvania with which he was associated. In addition to his hospital connections, he attended clinics one afternoon a week, and, on another afternoon, taught psychiatry and neurology at the Philadelphia College of Osteopathy. His sole office was located in Erlton, Delaware Township, Camden County, and his hours were by appointment in the mornings and evenings, five days a week. The duration of each appointment depended on the type of treatment involved, and varied from 10 minutes to 45 or 50 minutes. He was aided in his practice by two nurses.
Dr. Weiner's therapy consisted mainly of analysis and electric shock, in connection with which he would administer several kinds of drugs, including sodium surital, sodium amobarbital, atropine, methapyraline, hormones, vitamin B, and methan phetamine. In cases of narcoanalysis, the amount of drug injected was determined by the level at which the patient was able to start talking freely. He estimated that he had four to five dozen needles and syringes in the office. He purchased his medication (referring particularly to the sodium surital at this point) through one of the hospitals with which he was connected, in large quantities of five-gram vials. Since the vials were designed for multiple use, the contents would be reconstituted, in the *474 original vial, with 200 cc's of physiological saline. The drug would then be ready for use, each vial usually yielding about ten separate injections. Dr. Weiner said that he administered all intravenous injections personally but that intramuscular injections, such as pre-shock administrations of atropine and methapyraline, or vitamin and hormone injections, might be given by the nurses. He estimated that he administered an average of two to three dozen injections a day and the nurses another 20 or so. He maintained that patients would never, on an office visit, receive injections from his nurses without also seeing him.
Dr. Weiner's normal sterilization procedures consisted of depositing used needles and syringes in a container of commercial detergent, purely for cleansing purposes, for an hour or more, and, when a collection of used instruments had accumulated in the cleanser, placing them all in a hot air sterilizer (he also had a boiling water sterilizer in his office, which had not been in use since 1958) equipped with a laboratory timer. Since the sterilization procedures were usually carried out by his nurses, Dr. Weiner had no firsthand knowledge of their methods; but he said that their instructions were to run the sterilizer continually at a temperature of 375 degrees Fahrenheit and to set the timer, for each batch of instruments, for at least 15 minutes.
Dr. Weiner recalled that he had first encountered difficulty in his practice when a teen-age boy under narcoanalytic treatment came down with an attack of severe abdominal pain three days after his last injection, on July 14, 1960, and was admitted to Metropolitan Hospital for medical examination, which was inconclusive. The boy died on the following day, July 18. As the family refused to permit an autopsy, the case was referred to the County Coroner for a post-mortem; "phosphorous poisoning" was listed as the cause of death. Several deaths followed shortly thereafter (although it appears from Dr. Weiner's testimony that he was unaware of the one which occurred on July 28, 1960, and knew only of the death of Townsend L. Harris *475 on July 31, 1960). Following the last mentioned demise, the question arose as to possible toxicity of nardil (which the patient had been taking); Dr. Weiner and the attending physician called a physician at one of the pharmaceutical houses, but the inquiry apparently produced no results. On September 7, 1960 another death took place, with findings of "hepatic destruction"; however, a tissue analysis by a pathologist was inconclusive for either viral or toxic hepatitis. Another death occurred on September 15, 1960, the patient succumbing while on vacation in Illinois.
Following the sixth fatality (although, according to Dr. Weiner, it was only the fourth that he had learned about at that time), one George Lauer, who died on September 24, 1960 at the Delaware Valley Hospital, in Bristol, Pa., and an autopsy report of "hepatic necrosis," Dr. Weiner took steps to review his office procedures and techniques. He discussed the situation with Dr. Bond, the internist at Delaware Valley, and it was agreed that Dr. Weiner should review his sterilization procedures. One suggestion, which he immediately followed, was to substitute an autoclave (a steam-pressure device) for the hot air sterilizer he had been using. He also replaced all of his injection instruments with disposable needles, and he caused tissue specimens to be sent for examination to the Jefferson Medical College of Philadelphia and to the New Jersey State Police Laboratory. Dr. Weiner also called Dr. Ferren, the Township Health Officer (and a member of the State Board), who questioned him about his sterilization techniques. When Dr. Weiner assured him that he was careful in that respect, Dr. Ferren replied that that was all that was necessary and remarked, reassuringly, that several cases of infectious hepatitis had been encountered that year in the area.
Within a week or ten days thereafter, Dr. Weiner called the State Board of Health, and was referred to Dr. Dougherty. He told Dr. Dougherty that there had been several deaths of patients referred to him, and he requested a review of his steriliation techniques and suggestions for *476 improvements. Dr. Dougherty suggested that Dr. Weiner increase his time for autoclave sterilization; in addition, he offered to make an epidemiological study of Dr. Weiner's patients. Dr. Weiner testified that he hesitated to assent to this offer, because many of his patients had extremely nervous conditions and he did not want to further upset them. Apparently the study was not made at that time.
On October 24, 1960, by which time the total number of deaths had risen to nine, Dr. Weiner was visited at his office by Dr. Dougherty, who told him that an investigation was under way and instructed him to put aside all medication and to procure new drugs and new medication. Dr. Weiner immediately followed these instructions, and early the next morning he proceeded to purchase new medication; later that morning, however, he received the order from Commissioner Kandle prohibiting further injections.
By the time of the Princeton hearing, four more deaths had occurred, involving patients of Dr. Weiner. (The eventual totals for the period, January 1, 1960 to March 18, 1961, when the last death occurred, included 41 alleged cases of serum hepatitis, 15 of them resulting in death; several of the latter, however, occurred out of the State. There were 26 reported deaths in New Jersey in 1960 due to all types of hepatitis, though there is, of course, the possibility of incidence of undiagnosed deaths from this cause.) Dr. Weiner was asked, in his view, what had caused this situation. He responded:
"* * * In every case, starting with the first case which had no obvious connection with this type of condition. I have had consulting physicians, I have made each case either a coroner's case, where the family would not cooperate, or done a post-mortem; I have had or have countenanced ancillary studies in other institutions, and I cannot  I honestly cannot  arrive at a conclusion."
Dr. Weiner added that he was fully satisfied in his own mind that his sterilizer was being operated and had been operated properly. He denied any awareness or even suspicion *477 that his injections may have been connected in any way with the deaths until that of Lauer. He noted that drug jaundice was not altogether unusual in his practice, and that he encountered perhaps two to three cases a month upon administration of any of the thorazine group of medications, which he would immediately withdraw upon perceiving the jaundice.
As no further questions or comments were forthcoming, the Princeton proceeding was brought to a close at this point. By letter dated the following day, the secretary of the Board informed Dr. Weiner that pursuant to the decision of the Board at a meeting at Princeton on November 16, 1960, his license to practice medicine "is temporarily suspended, effective immediately, until the conclusion of the Board's investigation into certain alleged practices in the treatment of certain of your patients." The Board's ruling was stated to be based upon "the opinion that to continue the privilege of license to practice medicine in New Jersey to a doctor where the morbidity and mortality has reached the proportion which appears to be occurring in your practice is not in the public interest."
The next round of procedural skirmishes between Dr. Weiner and the Board was set forth extensively in our disposition of his motion for leave to appeal (67 N.J. Super. 199). The significant point is that the court recognized a right of appeal without leave as of April 20, 1961, and that notice of appeal was filed on April 27, 1961 (later amended to include the subsequent action of the Board, on May 11, 1961, outlined infra). By order of May 3, 1961, this court accelerated the hearing date of Dr. Weiner's appeal "because of the nature of the subject matter," and indicated appropriate filing dates for briefs and appendices.
On May 1, 1961 the Grand Jury of Camden County returned a 15-count manslaughter indictment against Dr. Weiner, each count pertaining to one of the deaths allegedly related to his practice. Trial on this indictment, originally scheduled for early June 1961 has, we are informed, been *478 postponed until the fall, pending resolution of preliminary defense motions.
On May 11, 1961 the Board adopted a resolution noting that: (1) its investigation "into certain alleged practices in the treatment of certain of the patients" of Dr. Weiner had been completed; and (2) an indictment was presently pending in the Camden County Court charging Dr. Weiner with the manslaughter of 15 persons. The resolution thereupon recited, by unanimous vote of the members purportedly present (see III (C) hereinafter), that "the temporary suspension of Dr. Albert L. Weiner's license to practice medicine in the State of New Jersey is hereby continued pending the final disposition of the aforesaid criminal proceedings in the Camden County Court, and upon such final disposition the temporary suspension shall continue until the State Board of Medical Examiners at its next meeting takes appropriate action with respect to such final disposition."
The Attorney General, appearing on behalf of the Board, moved before us, on May 15, 1961, to dismiss the appeal, or, in the alternative, for a stay of proceedings until final disposition of the criminal indictment. The reasons advanced were that the appeal had become moot because the May 11 suspension order had superseded the original order of November 16, 1960 and that, in any event, a determination of the appeal in favor of the licensee during the pendency of the criminal trial would prejudice the State's position in that proceeding. In denying these motions and ordering the appeal to proceed as scheduled, we remarked that, as to the first argument, the present appeal is not from the Board's original suspension as such, but rather from "the failure of [the Board] to terminate the suspension in the absence of preferment by it of charges against the licensee looking toward a statutory hearing after a reasonable time for completion of the investigation"; and as to the second contention, that possible prejudice of a criminal trial, the date of whose commencement was in some doubt, was here outweighed by the unfairness of continuing *479 to inflict upon the licensee the "irrevocable loss" attendant upon suspension without affording him a reasonably expeditious review of the "substantial legal questions" raised by his challenge to the Board's authority.
It should be noted that although Dr. Dougherty of the State Health Department, on March 23, 1961, made an affidavit in the early stage of this litigation to the effect that the deaths resulted from Dr. Weiner's "repeated and continued failure to use reasonable, standard and accepted medical practices in the treatment of his patients," the appellant has never been apprised by the State authorities of the basis of that conclusion, nor is it reflected anywhere in the present record. The Attorney General stated at oral argument that the investigation of the State has cleared the drugs used by Dr. Weiner of any causal connection with the outbreak of disease among Dr. Weiner's patients, and that the indictment is based solely upon the methods of administration of the drugs.

I.
Having conceded, by virtue of the Board's declaration that its investigation is completed, that the reason underlying the November 16, 1960 suspension order no longer exists, the Attorney General seeks to base the legal justification for continued deprivation of Dr. Weiner's license upon the Board's resolution of May 11, 1961. His argument, in a nutshell, is one of implied authority temporarily to suspend a license pending the outcome of a criminal indictment whose successful prosecution may afford the Board an express statutory basis for permanent revocation, to be found in N.J.S.A. 45:9-16, providing as follows:
"The board may refuse to grant or may suspend or revoke a license or the registration of a certificate or diploma to practice medicine and surgery or chiropractic filed in the office of any county clerk in this State under any act of the Legislature, upon proof to the satisfaction of the board that the holder of such license (a) has *480 been adjudicated insane, or (b) habitually uses intoxicants, or (c) has practiced criminal abortion, or been convicted of the crime of criminal abortion, or has been convicted of crime involving moral turpitude, or has pleaded nolo contendere, non vult contendere or non vult to an indictment, information, or complaint alleging the commission of the crime of criminal abortion or of crime involving moral turpitude, or (d) has advertised fraudulently, (e) becomes employed by any physician, surgeon, homeopath, eclectic, osteopath, chiropractor, or doctor who advertises fraudulently, or (f) shall have presented to the board any diploma, license or certificate that shall have been illegally obtained or shall have been signed or issued unlawfully or under fraudulent representations, or obtains or shall have obtained a license to practice in this State through fraud of any kind, or (g) has been guilty of employing unlicensed persons to perform work which, under this chapter (45:9-1, et seq.) can legally be done only by persons licensed to practice medicine and surgery or chiropractic in this State. The board shall refuse to grant or shall suspend or revoke any such license or the registration of any such certificate or diploma upon proof to the satisfaction of the board that the applicant for, or holder of, such license habitually uses drugs or has been convicted of a violation of or has pleaded nolo contendere, non vult contendere or non vult to an indictment, information or complaint alleging a violation of any Federal or State law relating to narcotic drugs. Before any license, or registration of a certificate or diploma to practice medicine or surgery or chiropractic filed in the office of any county clerk of this State under any act of the Legislature, shall be suspended or revoked, except in the case of convictions of criminal abortions or convictions of crime involving moral turpitude or plea of nolo contendere, non vult contendere or non vult to indictment, information, or complaint alleging commission of the crime of criminal abortion or crime involving moral turpitude, or convictions of violations of or pleas of nolo contendere, non vult contendere or non vult to an indictment, information or complaint alleging violations of any Federal or State law relating to narcotic drugs, the accused person shall be furnished with a copy of the complaint and be given a hearing before said board in person or by attorney, and any person whose license shall be suspended or revoked in accordance with this section shall be deemed an unlicensed person during the period of such suspension or revocation, and as such shall be subject to the penalties hereinafter prescribed for persons who practice medicine and surgery or chiropractic, without first having obtained a license so to do. Any person whose license, or registration of a certificate or diploma to practice medicine and surgery or chiropractic filed in the office of any county clerk of this State under any act of the Legislature, shall be suspended or revoked under the authority of this chapter (45:9-1, et seq.) may, in the discretion of the board be relicensed at any time to practice without an examination, or have his registration of *481 a certificate or diploma, as aforesaid, reinstated, on application being made to the board.
The record of conviction or the record of entry of a plea of nolo contendere, non vult contendere or non vult in any of the courts of this State, or any other State of the United States, or any of the courts of the United States, or the court of any foreign nation, shall be sufficient warrant for the board to refuse to grant or to suspend or revoke the license or the registration of a certificate or diploma to practice medicine and surgery or chiropractic filed in the office of any county clerk in this State under any act of the Legislature."
The Attorney General concedes, as indeed he must, that there is no other basis in the statute for suspension or revocation of appellant's license. Specifically, negligence, gross or otherwise, is not a ground thereunder for action by the Board. (A bill was introduced in the 1961 Legislature [Assembly Bill No. 654] adding "gross malpractice or gross neglect endangering life" to the statutory grounds for suspension or revocation of a license. The bill was not passed.)
The contention which is advanced for the power of suspension on behalf of the Board requires, first, an assumption that conviction of manslaughter may, under certain circumstances and particularly those herein, be reasonably found to constitute guilt of a "crime involving moral turpitude." From this premise, the Attorney General reasons that: (1) implicit in the grant of authority to suspend or revoke upon a finding as to any of the statutory violations which are the subject of hearing by the Board, is the power to suspend summarily and temporarily, pending hearing, on or even before the preferment of charges; and (2) assuming this power of temporary suspension, pending Board hearing on statutory charges, which, if substantiated, will empower the Board to suspend or revoke by final order, the power must also be taken to exist where the charges are pending before another public body, namely, a court of criminal jurisdiction, whose disposition thereof (after hearing by trial) will likewise be determinative of the Board's right of final suspension or revocation.
*482 Since we have determined, as developed under III, infra, that the State Board of Medical Examiners is without statutory authority to suspend a medical license merely because of the pendency of a criminal indictment against the licensee, it becomes unnecessary to resolve the question of whether manslaughter does or may, under certain circumstances, comprise a "crime involving moral turpitude." Nevertheless, because the issue is a significant one in the development of a body of occupational licensing law, in view of the fact that the question has been thoroughly briefed and ably developed by the parties at oral argument, and because the problem may well arise in the near future  conceivably in a dispute between these very principals  we deem it advisable at least to outline the competing arguments and policy considerations.

II.
A brief observation is in order regarding the available grounds for medical license revocation under the existing statute. The significant point here, as noted above, is that medical malpractice as such  whatever the degree of incompetence  is not a basis for Board interference with the licensee's right to practice. That this represents a deliberate legislative judgment can hardly be doubted in view of more severe revocatory provisions contained in cognate licensing statutes. Compare, e.g., with respect to dentists, N.J.S.A. 45:6-7 (d) ("willful and gross malpractice or willful and gross neglect"); embalmers and funeral directors, N.J.S.A. 45:7-62 (f) ("gross incompetence"); engineers, professional and land surveyors, N.J.S.A. 45:8-38 ("gross negligence, incompetency or misconduct"); bio-analytical laboratory workers, N.J.S.A. 45:9-42.13 (e), 9-42.22 (h) ("unprofessional conduct," as including "conduct, which in the opinion of the board, disqualifies a licensee to practice with safety to the public"); nurses, N.J.S.A. 45:11-32 ("incompetency"); and optometrists, N.J.S.A. 45:12-11 (b) ("gross incompetence").
*483 Thus, official administrative sanctions for gross incompetence must of necessity be brought within one of the stated classifications or else the subject license must remain unaffected. The Board here reasons that a potential conviction of Dr. Weiner for manslaughter might reasonably be considered to be conviction of a "crime involving moral turpitude." Our discussion herein concerns whether such an indictment could, under any circumstances, involve "moral turpitude," and, if so, whether the statute permits inquiry into such circumstances or calls for a determination of involvement of moral turpitude merely upon an evaluation of the abstract legal elements of the crime.
Appellant takes the position that manslaughter, by definition, lacks the essential moral element of evil intent and that we therefore need not look beyond the nature of the present indictment to conclude that, even upon conviction, sufficient grounds for final action on revocation of his license will not have been provided. It is also contended that since the Board may revoke upon the mere record of charge and conviction of such a crime, without other hearing, the statute contemplates that the nature of the crime  as involving moral turpitude or not  must be determined exclusively from its definitional nature without resort to the particular background facts involved dehors the record of charge and conviction. The Attorney General, on the other hand, urges that since the primary consideration in appraising a conviction for license revocation purposes should be the moral character of the defendant, it was the Legislature's intention that the nature of the crime, in the respect here being considered, must be found in the context of the particular facts and circumstances of the licensee's commission thereof.
What is "moral turpitude"? It has been defined as an "act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow men, to society in general, contrary to the accepted and customary rule of right and duty between man and man," Black's Law Dictionary *484 (4th ed. 1951); State v. McCarthy, 255 Wis. 234, 38 N.W.2d 679, 687 (Sup. Ct. 1949), and as, "in its legal sense * * * everything done contrary to justice, honesty, modesty or good morals." Huff v. Anderson, 212 Ga. 32, 90 S.E.2d 329, 331, 52 A.L.R.2d 1310 (Sup. Ct. 1955). The United States Supreme Court, in connection with alien deportation proceedings, has held that, in addition to "crimes * * * of the gravest character," any crime in which fraud is an ingredient involves moral turpitude. Jordan v. De George, 341 U.S. 223, 227, 71 S.Ct. 703, 706, 95 L.Ed. 886 (1951). See Berardi v. Rutter, 42 N.J. Super. 39, 48 (App. Div. 1956), affirmed sub. nom. In re Berardi, 23 N.J. 485 (1957). But the attempt to apply these definitions to specific criminal acts, especially in the context of license revocation proceedings, has demonstrated only the elasticity of the phrase and its necessarily adaptive character, reflective at all times of the common moral sense prevailing throughout the community. See State ex rel. v. Mason, 29 Or. 18, 43 P. 651, 652 (Sup. Ct. 1896).
For example, offenses held to involve moral turpitude warranting the suspension of a medical license include the dispensing and prescribing of narcotics for other than medicinal use, Du Vall v. Board of Medical Examiners of Arizona, 49 Ariz. 329, 66 P.2d 1026 (Sup. Ct. 1937); White v. Andrew, 70 Colo. 50, 197 P. 564 (Sup. Ct. 1921); Sapero v. State Board of Medical Examiners, 90 Colo. 568, 11 P.2d 555 (Sup. Ct. 1932); Speer v. State, 109 S.W.2d 1150 (Tex. Civ. App. 1937); Garlington v. Smith, 63 Ariz. 460, 163 P.2d 685 (Sup. Ct. 1945); Meyer v. Board of Medical Examiners, 34 Cal.2d 62, 206 P.2d 1085 (Sup. Ct. 1949); issuing a check with insufficient funds, with intent to defraud, Bancroft v. Board of Governors, 202 Okl. 108, 210 P.2d 666 (Sup. Ct. 1949); possession of counterfeit money with intent to circulate same, State Medical Board v. Rodgers, 190 Ark. 266, 79 S.W.2d 83 (Sup. Ct. 1935); sending through the mails notices and information advertising the performance of criminal abortions, State Board of *485 Medical Examiners v. Harrison, 92 Wash. 577, 159 P. 769 (Sup. Ct. 1916); repeated acts of indecent exposure, Brun v. Lazzell, 172 Md. 314, 191 A. 240, 109 A.L.R. 1453 (Ct. App. 1937); fraudulent claims of treatment of disabled veterans while employed by the government, Craft v. Balderston, 58 Idaho 650, 78 P.2d 122 (Sup. Ct. 1938); willful attempt to evade federal income taxes, In re Kindschi, 51 Wash.2d 8, 319 P.2d 824 (Sup. Ct. 1958); and selling bogus diplomas and licenses through the mails, State ex rel. Munch v. Davis, 143 Fla. 236, 196 So. 491 (Sup. Ct. 1940).
On the other hand, the unlawful sale of liquor, Fort v. City of Brinkley, 87 Ark. 400, 112 S.W. 1084 (Sup. Ct. 1908), and the offense of disturbing the peace, Wyatt v. Cerf, 64 Cal. App.2d 732, 149 P.2d 309 (D. Ct. App. 1944) have been held not to involve moral turpitude.
The effort to classify manslaughter as involving or not involving moral turpitude does not lead to entirely satisfactory results. The common law distinction between offenses malum in se and those malum prohibitum is of little help in this regard. See Du Vall v. Board of Medical Examiners of Arizona, supra, 66 P.2d, at p. 1030. The difficulties are multiplied when we pass to a consideration of the two branches of manslaughter, keeping in mind that our own statute, N.J.S. 2A:113-5, does not differentiate between them.
Manslaughter consists of unlawful homicide, without either express or implied malice aforethought; the absence of the latter element distinguishes it from murder. Chase's Blackstone, Commentaries on the Laws of England, (4th ed. 1919), pp. 939-40; 1 Wharton, Criminal Law and Procedure (Anderson, ed. 1957), § 271, p. 574. It may be voluntary, as a felonious and intentional killing ordinarily committed in a sudden heat of passion, caused by adequate legal provocation, State v. Zellers, 7 N.J.L. 220, 243 (Sup. Ct. 1824), 1 Wharton, supra, § 274, p. 580, or involuntary, in the commission of an unlawful act or by culpable negligence in performing a lawful act or omitting *486 to perform a legal duty. State v. Blaine, 104 N.J.L. 325 (E. & A. 1928); State v. Brown, 22 N.J. 405, 411 (1956); 1 Wharton, supra, § 289, p. 605. The only specific intent required is the intent to do the act resulting in the death, rather than intent to do a harm. State v. Diamond, 16 N.J. Super. 26, 31 (App. Div. 1951). In the area of medical malpractice, manslaughter may be deduced from criminal negligence on the part of a physician or surgeon through gross ignorance of the science practiced and the effect of the remedies employed, gross negligence in the application and selection of remedies, lack of proper skill in the use of instruments, or failure to give proper instructions to the patient as to the use of the medicines. Chase's Blackstone, supra, at p. 943; 1 Wharton, supra, § 294, pp. 618-20. Illustrative is Commonwealth v. Pierce, 138 Mass. 165 (Sup. Jud. Ct. 1884), where a physician who caused a bedridden patient to be kept in flannels saturated with kerosene for several days, by reason of which she died, was held guilty of manslaughter.
Unless we are willing to say that any grossly negligent act which happens to result in death  whatever the awareness of the actor of the danger of the act, as long as he intended to do the act  involves moral turpitude, we are led towards the conclusion that moral baseness and depravity do not necessarily inhere in the crime of manslaughter. See United States ex rel. Mongiovi v. Karmuth, 30 F.2d 825 (D.C.W.D.N.Y. 1929), in which the New York statutory crime of second degree manslaughter was held not to involve moral turpitude. But cf. Board of Governors of Registered Dentists of Oklahoma v. Brown, 182 Okl. 243, 76 P.2d 1074 (Sup. Ct. 1937). The direction of our thought is reinforced when we consider that, for present purposes, the crime must be viewed in all of its potential factual shadings. Would we consider, for example, the killer of his wife's paramour, upon discovery of the two in flagrante delicto, to have committed a vile and immoral act? Or does one who is grossly negligent, but ignorant of his imprudence, thereby necessarily *487 manifest an essential baseness of character? We do not read the present state of public morality as necessarily regarding, as base and wicked, acts committed in the heat of a passion which the law recognizes as justifiably provoked, or actions which demonstrate merely ignorance (however unjustifiable) of the steps and procedures which a reasonable man would have taken in a given situation.
On the other hand, we cannot altogether accept appellant's notion that manslaughter, even involuntary manslaughter (which is contemplated as the factual substance of the State's case against Dr. Weiner), can under no circumstances involve moral turpitude. As stated, manslaughter, in the form of culpable negligence, may well be the result of an unreasonable risk of danger to life and limb which the actor was aware of or should have been aware of. We do not foreclose the possibility that, notwithstanding its irrelevancy to his criminal culpability, the factual distinction between actual knowledge of the risk and constructive knowledge thereof may well be pertinent to his moral culpability. See, as bearing on this possible distinction, A.L.I., Model Penal Code, Tentative Draft No. 4, § 2.02 (c), p. 13, Tentative Draft No. 9, § 201.4, Comment 1, p. 49, distinguishing between "reckless" action (conscious disregard of a substantial and unjustifiable homicidal risk created by the actor's conduct), classified by the Institute as "manslaughter," and mere "negligent" action (where the actor "should be aware" of a substantial and unjustifiable homicidal risk), categorized as "negligent homicide." In the realm of moral reprehensibility, the line between conscious indifference to human life and safety, on the one hand, and failure, through ignorance, to adhere to common standards of care, on the other, may be more than illusory, notwithstanding that both forms of conduct, due to the absence of malice aforethought, may be criminally designated as manslaughter. The concept that negligence may, under certain circumstances, involve moral turpitude is not entirely novel. In the regulation of attorneys' conduct, gross carelessness *488 and negligence have been held to constitute "acts" involving moral turpitude, as a breach of the attorney's fiduciary relationship requiring of him conscientious fidelity. Waterman v. State Bar of California, 8 Cal.2d 17, 63 P.2d 1133, 1134 (Sup. Ct. 1936); Bruns v. State Bar of California, 18 Cal.2d 667, 117 P.2d 327, 331 (Sup. Ct. 1941); Stephens v. State Bar of California, 19 Cal.2d 580, 122 P.2d 549, 550 (Sup. Ct. 1942).
What this inquiry suggests is that in a wide range of crimes, including manslaughter, the fact of moral turpitude may not necessarily be ascertainable from either the indictment or the record of conviction, but may have to be sought in the details of the manner in which the particular defendant perpetrated the offense. We are therefore led to consideration of the second phase of the appellant's contention with respect to the criteria of a crime involving moral turpitude, as contemplated by the statute  namely, that in order to permit a license revocation on that ground, it must be found that moral turpitude is of the essence of the crime for which conviction has been obtained, necessarily ascertainable from the legal constituents of the crime and without inquiry into the facts and circumstances leading up to the conviction. Though we do not decide this issue, presentation of the competing considerations leads strongly in the direction of the appellant's thesis.
There is ample support both in logic and in precedent, as applied to the statute under review, for the position that the bare record of conviction is contemplated as the sole object of official scrutiny, and that the Board's warrant for depriving a licensee of his livelihood must stand or fall upon whether moral turpitude is of the essence of the convicted crime. In essence, appellant argues that the statute contemplates that the question whether a crime involves "moral turpitude" is a legal and not a factual question, to be determined in cases of doubt by the court and not by an administrative fact-finding inquiry. There is *489 cogent justification for this position in the scripture of the statute.
We note initially, as bearing upon this view, that the statute is silent with respect to post-conviction hearing by the Board; it treats record proof of conviction as conclusive of the event of conviction of a crime of the statutory description. The statute makes a hearing on charges a prerequisite for any suspension or revocation "except in the case of" conviction or pleas on criminal charges of the type specified therein. The absence from the statute of any procedural device for determining whether a crime involves "moral turpitude" leaves open many important questions, if indeed the Legislature intended that the Board itself determine extra the record whether "moral turpitude" is present on the basis of the constituent facts and circumstances. Upon what facts may the Board pass? May it conduct its own hearing, take new testimony and find facts in accordance with its own impressions? If so, the record of conviction would be meaningless and would serve merely as an opening wedge for the Board's inquiry into the licensee's activities. The fact of conviction would necessarily be irrelevant to such an inquiry  whose concern would be not as to commission of a "crime" involving moral turpitude but as to commission of "acts" involving moral turpitude, an entirely different standard, not sanctioned by the statute. The Board might in such a case predicate its determination on acts or a state of mind found to have been committed or to have existed, even though the jury, while nevertheless properly determining guilt, might not have made those findings.
Or would the Board merely scrutinize the trial testimony and draw its conclusions therefrom? The same objection might be made as to abandonment of conviction as the determinative factor, clearly so designed by the Legislature, and a substitution by the Board of acts it finds to have been committed which the jury may not have found. And what, if this is the procedure contemplated, would be done with the licensee who enters a plea of non vult, nolo contendere, *490 or non vult contendere  where there is no record to review? Is the Board to be permitted to find "moral turpitude" on the basis of any facts it finds on a plenary hearing, whether or not they bear upon guilt of the crime to which the licensee has pleaded?
It may be suggested in response, as to the situation of a plea, that the Board might determine whether the facts shown upon a post-conviction hearing reveal a minimum sufficing to establish guilt of the crime and whether those facts alone impute "moral turpitude." In case of a conviction by jury, it might be argued that the same test should be applied to the trial transcript. Any of the potential post-conviction procedures mentioned would seem necessarily to entail an awesome prospect of complex factual and sophisticated legal determinations, hardly the usual or appropriate function of an administrative licensing body. These considerations, as well as the face of the act, suggest strong doubt as to any construction of the statute which would allow the Board to make a factual decision as to whether the licensee's crime involved moral turpitude on facts outside the record of conviction.
Backing for appellant's approach, focusing exclusively on the conviction record, may be found in Lorenz v. Board of Medical Examiners, 46 Cal.2d 684, 298 P.2d 537, 538 (Sup. Ct. 1956). Lorenz dealt with a medical licensing statute which permitted sanctions against any licensee guilty of unprofessional conduct, and which provided that a record of conviction of an offense involving moral turpitude would be "conclusive evidence of such unprofessional conduct."
Justice Traynor, speaking for the court, held that:
"Under the plain language of [the statute] it is the conviction alone of an offense involving moral turpitude that empowers the board to suspend or cancel a license. Since the record of conviction is conclusive evidence of the unprofessional conduct, the circumstances in which the crime was in fact committed cannot be considered. Moral turpitude must be inherent in the crime itself to warrant cancellation or suspension of a license because of the conviction. [Citation omitted] Moral turpitude is not inherent in the *491 crime itself unless a conviction in every case would evidence bad moral character. Only if the minimum elements for a conviction necessarily involve moral turpitude and a conviction cannot be had without proof of facts showing moral turpitude, can the conviction be held to be of an offense involving moral turpitude."
Also see State v. Willstead, 248 Wis. 240, 21 N.W.2d 271, 272 (Sup. Ct. 1946).
In support of the proposition that the facts and circumstances of the particular incriminating conduct must be examined to determine the presence or absence of moral turpitude, the Attorney General brings to our attention a number of California disbarment cases, among them In re Hatch, 10 Cal.2d 147, 73 P.2d 885 (Sup. Ct. 1937), and In re Rothrock, 16 Cal.2d 449, 106 P.2d 907, 131 A.L.R. 226 (Sup. Ct. 1940).
In Hatch (73 P.2d, at p. 886), the court was presented with the question of whether violation of the state Corporate Securities Act, by the known participation of the defendant in the issuance and sale of securities without a permit, involved moral turpitude. The court noted that there were crimes which undeniably involved moral turpitude, such as murder, embezzlement, and extortion; crimes which unequivocally did not, such as violations of police regulations or simple assault and battery; and "a field of doubtful cases where the determination as to whether moral turpitude was involved may fall on one or the other side of the line, depending upon the circumstances of the particular case." The doubtful cases, it was held, were to be resolved by the court, or, in accordance with the Code of Civil Procedure, left to the jurisdiction of the State Bar for determination in a disciplinary proceeding. In Rothrock, similar sentiments were echoed with respect to an attorney convicted of assault with a deadly weapon, the court remarking (106 P.2d, at pp. 910-911):
"In the final analysis the purpose of any disbarment proceeding is not to punish the attorney  in the case of a criminal act he is *492 amenable to punishment under the penal statutes  but is to afford protection to the public and to the profession by an investigation respecting the moral fitness of the attorney to continue in the practice of the law. * * * Therefore, in convictions presenting doubtful cases on the question of moral turpitude, where the perpetrator of the offense is an attorney, the question whether the act involves moral turpitude properly may be resolved by a consideration of the nature of the offense as it bears upon his moral fitness to continue in the practice of the law. A consideration alone of the nature of the offense, therefore, may disclose that conviction thereof would not result in loss of the respect and confidence of his fellowmen, if his name be continued on the roll of attorneys. If that be the result of the consideration of the record of conviction alone, the conclusion may well be determinative of the question of moral turpitude, and the offense of which the attorney was convicted will be held not to involve moral turpitude. If, however, the nature of the offense, considered alone or in connection with the record of conviction and the statutes defining the particular offense, does not disclose that the commission thereof would or would not cast discredit upon the attorney's moral fitness to practice law, then an investigation into the circumstances will be permitted."
The Attorney General's position, then, focusing upon N.J.S.A. 45:9-16, is that while the record of conviction is made the determinative factor with respect to potential Board action, once conviction is secured, a further inquiry must necessarily be made to determine whether the crime involved "moral turpitude"  and this determination should be undertaken by the body most intimately concerned with the moral capacity of the licensee, based upon the facts and circumstances which produced his conviction. In the area of medical licensing, this approach found support in Brainard v. State Board of Medical Examiners, 68 Cal. App.2d 591, 157 P.2d 7 (D. Ct. App. 1945), which, however, was expressly disapproved and overruled in Lorenz v. Board of Medical Examiners, supra. Compare United States ex rel. Mazzillo v. Day, 15 F.2d 391 (D.C.S.D.N.Y. 1926); Application of Jones, 4 A.D.2d 994, 168 N.Y.S.2d 42 (App. Div. 1957). But the unfair possibilities of this approach are indicated by the result in the Brainard case, supra. The licensee therein was convicted of violation of a statute requiring the keeping by a physician of *493 records of narcotics dispensed by him. The Medical Board was permitted to find that this crime involved moral turpitude on the basis of its own hearing disclosure that the licensee had sold narcotics to an addict. Obviously, this physician lost his license not because the crime he was convicted of involved moral turpitude, but because of a separate and distinct act, for which he was not convicted. By contrast, in the Lorenz case, which overruled Brainard, the court held that conviction of a physician for furnishing liquor to a minor was not conviction of a crime involving moral turpitude, notwithstanding the act was done in a motel as a preliminary to homosexual activities. The court held that the latter circumstances were no part of the crime for which the defendant had been convicted and therefore were not a criterion of the moral character of the offense.
It might be pointed out, in relation to the Attorney General's argument, however, that even as the statute now stands, the Board would appear to be vested with discretion, upon entry of a conviction of a crime involving moral turpitude, to consider the nature and seriousness of the acts perpetrated, i.e., the degree rather than the fact of moral turpitude, and the relation of such acts to the practice of medicine, for the purpose of deciding the extent of the penalty to be imposed, whether suspension for a term or revocation. For that purpose, the Board should not be limited to perusal of the conviction record. But in such a procedure, the Board is merely determining penalty, guilt of a crime involving moral turpitude having been established on the basis of the jury verdict or the licensee's admission. Such a collateral inquiry is entirely distinguishable from one whose outcome would control the power of the Board to take final action at all, as suggested by the Attorney General.
In summary, the considerations bearing upon the issue just discussed are substantial on both sides. Favoring the Attorney General's position is the fact that it is the "moral turpitude" element which should really concern the Board *494 in its licensing function, and that element may not always be readily apparent on the face of the conviction, especially where baseness or evil intent is not an essential definitional component of the crime but may nonetheless be an almost certain conclusion from the facts of the particular case. Weighing heavily in the opposite direction are the express language of the statute, contemplating examination of the conviction record as the sole determinant of professional moral guilt, and the absence of any statutory reference to a post-conviction hearing or to the manner in which same would be conducted  in a situation where the mechanics of such a hearing are crucial.
Having regard for the difficulty and importance of the issue, we are not determining it on this appeal. If Dr. Weiner is acquitted, the question will become moot. The decision of the present appeal turns solely on the Board's lack of power to suspend pending trial of an indictment against the licensee.

III.

(A).
Basic to the contention in favor of the power of temporary suspension pending disposition of the indictment is the assumption that, with respect to license violations remediable by the Board after hearing by it, upon or even prior to the preferment of charges and prior to hearing, the Board has the implied statutory authority to suspend temporarily pending hearing and adjudication of the charge. The Attorney General directs our attention to the broad range of statutory supervision over the practice of medicine invested in the Board, emphasizes the axiom that grants of express power to administrative agencies are always attended by incidental authority reasonably necessary to effectuate the express grant, Lane v. Holderman, 23 N.J. 304, 315 (1957), invokes purportedly analogous authority for summary revocation where protection of the public is the signal consideration, and concludes *495 that the safeguarding and punitive power of the Board herein, by means of license control, must be impliedly accompanied by the means and might to temporarily barricade grave abuse of the license privilege pending the mechanics of hearing proceedings.
Appellant's response is directed not as much to the matter of advisability of such power as to the express language of the statute which, he maintains, is plainly restrictive of suspension authority in advance of preferment of charges and hearing thereon; without express statutory authorization, he argues, summary revocation or suspension is clearly not within the jurisdiction of the Board.
Whether labeled for constitutional purposes as a "privilege" or "property right," it is clear that the right to follow one's chosen profession is a fundamental element of citizenship and that one cannot be prevented from practicing except for valid reasons arrived at in orderly and fair fashion. Schware v. Board of Bar Examiners, 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796, 801 (1956); Greene v. McElroy, 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377, 1388 (1959); cf. State v. Chapman, 69 N.J.L. 464 (Sup. Ct. 1903), affirmed o.b., 70 N.J.L. 339 (E. & A. 1904); Unger v. Landlord's Management Corp., 114 N.J. Eq. 68 (Ch. 1933). Balanced against this right, however, is the State's basic interest in preservation and protection of the public health and welfare; and, in a manner reasonably in pursuance of this objective, as an adjunct of its police power, the State may regulate and control a profession entailing special knowledge, training and skill and intimately related to the physical well-being of the community. Abelson's, Inc. v. New Jersey State Board of Optometrists, 5 N.J. 412, 418-419 (1950); Schireson v. State Board of Medical Examiners, 129 N.J.L. 203, 206 (Sup. Ct. 1942), reversed on other grounds 130 N.J.L. 570 (E. & A. 1943); 41 Am. Jur., Physicians and Surgeons, § 8, p. 138; 70 C.J.S. Physicians and Surgeons §§ 2-4, pp. 818-825. The most common means of effectuating this *496 regulatory power is through delegation to an administrative board. And the most generally accepted technique for control purposes is the requirement that a license be obtained as a condition of engaging in practice. 70 C.J.S., supra, § 6, p. 826. Implicit in the licensing philosophy, of course, and expressly provided in such regulatory legislation, is the power to revoke or suspend the license when the behavior of the licensee is found to be inconsonant with criteria which are stated with reasonable clarity and certainty and are arguably reflective of the State's interest in preservation of the public health and welfare.
Comprehensive legislative medical licensing power is vested by statute in the State Board of Medical Examiners. N.J.S.A. 45:9-1 et seq. The Board is given the power to process and review license applications, N.J.S.A. 45:9-6, to examine the educational background of applicants to determine whether they have met the statutory requirements, N.J.S.A. 45:9-7, 45:9-8, to conduct written examinations, N.J.S.A. 45:9-15, to refuse to grant, and suspend or revoke licenses, N.J.S.A. 45:9-16, and, armed with the sanctions of fine, imprisonment, and injunction, to vigorously pursue those who are practicing contrary to law. N.J.S.A. 45:9-22 to 45:9-27.4. Attendant upon this grant of authority is the built-in limitation upon any body whose prime function is to administrate  it must exercise its functions within the scope of the power validly delegated to it by statute. We do not doubt that this includes "incidental authority," to do that which is "fairly and reasonably necessary or appropriate" to implementation of the function expressly authorized. Lane v. Holderman, supra; Cammarata v. Essex County Park Commission, 26 N.J. 404, 411 (1958).
But is the power to suspend temporarily reasonably necessary to render effective the express authority of final suspension or revocation? The Board argues that it is, stating that its protective duties relative to license revocation could not be effectively and expeditiously exercised if a licensee were allowed to continue to endanger the public welfare prior *497 to or during the pendency of charges and prior to actual hearing and disposition. It relies upon Russo v. Walsh, 18 N.J. 205 (1955), De Marco v. Board of Chosen Freeholders of Bergen County, 21 N.J. 136 (1956), and Graham v. City of Asbury Park, 64 N.J. Super. 385 (Law Div. 1960) as local precedent for its position and cites Professor Davis [1 Administrative Law, (1958), § 7.08, p. 438] for the supporting proposition that "drastic administrative action is sometimes essential to take care of problems that cannot be allowed to wait for the completion of formal proceedings." Appellant's reply is constructed upon the express declaration of the statute that, except in case of conviction of a crime specified in the statute, or an equivalent plea, a license may not be suspended or revoked until the accused has been "furnished with a copy of the complaint and * * * given a hearing before said Board in person or by attorney."
While we appreciate the force of appellant's reliance upon the apparently absolute language of the statute and shall, in fact, advert to it infra, we are willing to proceed, at least by way of assumption, along that portion of the Attorney General's path of argumentation which concludes a power of temporary suspension pending formal hearing by the Board on charges already preferred against the licensee. Such a power may arguably be implied from the Board's overall suspension and revocation authority. Among the considerations persuasive of such a view are the ever-present need for immediate and effective preventative action, the implication from the formal preference of charges that the Board has already given extensive firsthand consideration to the matter and is inclined, on the evidence available, to finalize revocation or suspension, and the assurance to the licensee that the case on behalf of the imposition of permanent punishment has already been prepared and that final hearing, since it awaits only the time necessary for him to fashion his own legal and factual position, will take place within a reasonable period.
*498 This was essentially the procedure followed by the Governor in Russo v. Walsh, supra, where he issued an executive order suspending Russo from his position as Assistant Chief Examiner of Civil Service "pending the hearing and determination of charges against him of malfeasance and misfeasance in office." The Supreme Court inferred, from the constitutional provision empowering the Governor to remove State officers and employees from their positions after notice, charges, and hearing, the authority to suspend temporarily "as a means of rendering impassive a public employee as an incident to and pending his trial for misconduct." The court noted the presence of considerations minimizing the chances that its construction of the Constitution would give rise to arbitrary abuses (18 N.J., at p. 213), with particular emphasis upon the fact that "appellant's suspension was ordered only after an officer appointed by the Governor had conducted an investigation and formal charges had been filed, of which appellant was given notice simultaneously with the suspension order."
(We should not be understood as approving the summary suspension of Dr. Weiner's license by the Board on November 16, 1960. This action, taken after the informal Princeton meeting detailed supra, in which not even the semblance of legal procedure was adhered to and wherein it was expressly declared on behalf of the Board that there were no charges pending against Dr. Weiner, was entirely without statutory justification and represented merely the Board's ad hoc reaction to an exceptional set of circumstances. The immediate peril to the public interest had already been averted by the order of the State Health Department prohibiting the doctor's administration of drugs.)

(B).
Having tentatively accepted the first stage of the Attorney General's contention, we are confronted with his effort to analogize the present situation to it. He urges that where, as here, there is pending against the licensee a specific set *499 of charges in the form of a criminal indictment, presumably grounded in reasonable or probable cause, see Graham v. City of Asbury Park, supra, 64 N.J. Super., at pp. 391-392; People v. Nathanson, 134 Cal. App.2d 43, 284 P.2d 975 (D. Ct. App. 1955); 42 C.J.S. Indictment and Information § 24(3), p. 871, and subject to the organized processes of legal resolution, which charges  if they mature into conviction  will arguably justify license revocation, similar authority for temporary suspension pending final disposition of the charges is reasonably to be implied from the statute. That the charges have been returned against the licensee by an authority other than the Board is of little consequence in the Attorney General's view; the point stressed is that the accused has become prima facie suspect of activity warranting permanent revocation, and that temporary action is thus in the public interest.
The superficial attractiveness of this argument dissolves rapidly upon closer examination in the light of the statutory language. It must be remembered that we are here seeking to search out, within reasonable interpretative limits, a legislative intent, with reference to the issue under discussion, compatible with the general purpose of establishing a license revocation procedure which is solicitous of the interests of both the public and the medical profession. Admittedly, much in the administration of the revocation machinery, on a case-to-case basis, is left to the discretion of the Board. But in construing this statute, we must determine the limits within which it was intended that this discretion be confined. And we cannot be a party to the making of bad law simply because the public or, for that matter, this court, may justly be gravely concerned at the serious outbreak of disease and death which centered about the appellant's practice. The harsh facts of the instant case cannot be permitted to becloud the crucial question of whether it was intended that the Board have power to suspend a medical license pending the outcome of an indictment for any crime involving moral turpitude  e.g., one *500 unconnected with the practice of medicine  such as the offenses of unlawful concealment of assets or perjury in bankruptcy proceedings, as in Schireson v. State Board of Medical Examiners, supra. Clearly such power does not exist in the present case unless it exists in any case of an indictment for a crime involving moral turpitude.
It is to be noted, in examining this question, that unlike the other grounds for revocation (with the exception of conviction for criminal abortion or violation of state or Federal narcotics laws), the "moral turpitude" basis does not require a hearing at any stage; the record of conviction or of plea equivalent thereto forms a sufficient foundation for the imposition of sanctions by the licensing authority, and, indeed, is the express stage in the evolution of such a proceeding at which final action may be taken. Schireson v. State Board of Medical Examiners, supra.
Our reading of the statute and balancing of the relevant policy considerations convinces us that to accede to the Attorney General's position would entail an unrealistic and unwarranted interpretation of the legislative design. The considerations in favor of the conclusion of power of temporary suspension following formal charges by the Board and prior to administrative hearing were: (1) the need for effective and immediate prevention of a situation presenting imminent danger to the public welfare; (2) reasonable assurance of intimate familiarity with the facts and probable cause for anticipating permanent action, on the part of the Board, due to the fact that its investigative machinery has already been utilized; and (3) the truly temporary nature of the suspension, because of the guarantee of prior Board preparation and the reasonable imminence of final hearing. To these may be added a fourth factor, inhering in the nature of the statutory violation under consideration. Aside from the "moral turpitude" conviction ground, all of the bases for license revocation relate in a direct way to either the physical and mental capacity of the licensee, or to the manner in which he conducts his medical practice or behaves in reference *501 to standards and ethics peculiar to it  to wit, insanity, habitual intoxication, fraudulent professional advertising, practicing of criminal abortions, conviction of abortion or narcotics offenses, employment by one who advertises fraudulently, obtaining a diploma, license or certificate by fraudulent or illegal means, and employing unlicensed persons to perform work legally performable only by persons licensed to practice medicine, surgery, or chiropractic. As will be seen hereinbelow, that direct relationship is not necessarily existent in the instance of "moral turpitude" indictments under the statute.
While a threat to the public welfare may, in some cases, be present in the instance of conduct warranting grand jury indictment but not affecting the practice of medicine, the absence of the other mitigating factors mentioned above demands rejection of absolute summary suspension power by the Board in such a situation. There is no guarantee whatsoever in such a case that the administrative and investigative machinery of the Board has been wheeled into operation, and that final determination is imminent and awaits only the readiness of the licensee. On the contrary, while the licensee has been charged by the State with a serious offense against the peace and dignity of the same, the Board may know nothing at all about the case before the indictment, trial (it may be noticed) is very likely a considerable time away, there may possibly be more than one trial before disposition of the indictment is accomplished, and, most important of all, there stands between the licensee and conviction (and hence final determination of the revocability of his license) a presumption of innocence which must be overcome by evidence demonstrating his guilt beyond a reasonable doubt. It cannot be overlooked that in the area of "moral turpitude," the Legislature has chosen to equate moral conviction with legal conviction by a criminal jury, rather than, as regards most of the remaining statutory grounds for revocation, permitting disciplinary action "upon proof to the satisfaction of the board."
*502 Finally, as noted above, indictment for "crime involving moral turpitude" may well relate to activities which, while morally reprehensible, may have no direct connection with the physical capacity or professional methods of the practitioner in a way that would warrant summary measures in order to shield the public health. Can it reasonably be imagined that the Legislature contemplated that a physician indicted, for example, for filing a fraudulent income tax return, or for causing death by automobile (if this involves moral turpitude), could thereupon, without more, be suspended by the Board from the practice of medicine pending final disposition of such an indictment? The policy considerations favoring such an interpretation dissolve to the vanishing point, and yet, as we have pointed out, this is the construction we must arrive at if the power here assumed by the Board is to be sustained. Moreover, the State has not claimed that the Board has ever before exercised the power of suspension of a physician upon mere indictment. If the power has never heretofore been exercised, this alone should create serious doubt as to its existence.
The Attorney General argues that since conviction of "moral turpitude" crimes represents, in the Legislative judgment, sufficient depravity of character to justify withdrawal of the right to practice the profession, and since distinctions and shadings of degree must be left to the discretion and expert judgment of the Board, there is no reason why such discretion may not be permitted to operate in the area of post-indictment suspensions, particularly where the offense charged is related to the practice of the profession. The short answer to this is that we are here concerned not with the probable reasonableness of administrative determinations but with the legislative purpose in terms of empowering the Board to act at all prior to conviction of the licensee. We are of the firm conviction that there is no statutory underpinning for the temporary suspension of a medical license on the sole ground that indictment for a "crime involving moral turpitude" has been returned against the licensee. *503 There is neither legislative language nor a reasonable basis for imputation of probable legislative purpose towards that end.
Cases involving the summary suspension of law enforcement officers, pending the disposition of criminal indictments returned against them (as in De Marco v. Board of Chosen Freeholders of Bergen County, supra), are not apposite. The police officer stands in the delicate position of one who symbolizes to the public that which is morally and legally correct, see In re Emmons, 63 N.J. Super. 136, 140 (App. Div. 1960); he must be beyond reproach and his conduct, to be deserving of official reprimand, need only cast doubt on his adherence to that high standard and need not even constitute violation of any specific rule or regulation. City of Asbury Park v. Department of Civil Service, 17 N.J. 419, 429 (1955). And, unlike the present situation, disciplinary or punitive action against a police officer is not entirely dependent upon the outcome of criminal proceedings. See State v. Cohen, 32 N.J. 1, 11-13 (1960).
The overriding interest in the public safety, soundly established in precedent in the instance of a possibly defaulting public servant, furnishes an additional legal justification for treating his indictment as a proper signal for removal from his public functions. As noted in State ex rel. Campbell v. Police Commissioners, 16 Mo. App. 48, 50 (Ct. App. 1884), "the suspension of an officer, pending his trial for misconduct, so as to tie his hands for the time being, seems to be universally accepted as a fair, salutary, and often necessary incident of the situation." The power of summary removal of police officers is said to derive from "the authority to make rules and regulations and to maintain efficiency and discipline * * * [i]t lacks the element of vacancy in office created by removal, and is more subsidiary to continuance in office than to separation from it * * * [i]t is a supervisory act rather than a discharge, and is either a disciplinary punishment for misconduct or a measure in the avoidance of disturbance, as the case may be." Labonte *504 v. City of Berlin, 85 N.H. 89, 154 A. 89, 91 (Sup. Ct. 1931).
That similar considerations do not pertain in the area of medical licensing  except in isolated cases  goes far towards destroying the attempt to fashion an analogy which will fit within the statutory language. Silver v. McCamey, 95 U.S. App. D.C. 318, 221 F.2d 873 (D.C. Cir. 1955), containing dicta in support of temporary suspension of a hack license pending the outcome of criminal proceedings, is not applicable; the court therein was speaking of temporary suspension after hearing, on a statute authorizing the commissioners "to revoke any license * * * when, in their judgment, such is deemed desirable * * *."
Our discussion of summary revocation and suspension on the basis of pending criminal indictment, while, naturally, not entirely divorced from policy considerations, is directed mainly towards an evaluation of the legislative purpose underlying N.J.S.A. 45:9-16. For a comprehensive exposition of the pertinent competing considerations relative to summary administrative action pending full hearing by the agency itself, see Gellhorn and Byse, Administrative Law, Cases and Comments (1960), "The Problem of License Revocation," pp. 759-67; also see 1 Davis, supra, § 7.08, pp. 438-44. Whether a statute (or rules and regulations adopted pursuant thereto) clearly expressive of broader authority than the instant statute gives the Board would be upheld as reasonable, is a separate question, for resolution in a case presenting the issue. The bulk of the authorities relied on by the Attorney General, involving express statutory authorization for summary action, is for that reason here inapplicable. See Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947); Haney v. Compton, 36 N.J.L. 507 (E. & A. 1873); Halsey, Stuart & Co. v. Public Service Commission, 212 Wis. 184, 284 N.W. 458 (Sup. Ct. 1933); S.S. Pike Co. v. City of New York, 169 Misc. 109, 6 N.Y.S.2d 957 (Sup. Ct. 1938); Thornhill v. Kirkman, 62 So.2d 740 (Fla. Sup. Ct. 1953); Commonwealth *505 v. Walkinshaw, 373 Pa. 419, 96 A.2d 384 (Sup. Ct. 1953). It should be noted that none of the foregoing cases involved a statute granting an administrative board the power of summary revocation of a license pending trial of an indictment of the licensee.
We do not make light of the important public health considerations encompassed in the State's contentions, or the genuineness of its concern over the potential public menace of one whose practice has produced results which, in its opinion, cast some doubt, at least circumstantially, upon his adherence to accepted and reasonable professional standards. But adequate machinery to act upon the basis of such considerations must, under our constitutional scheme of separation of powers, be provided by the Legislature, N.J. Const., (1947), Art. III, par. 1. It is not our function to question the wisdom of existing law, and our powers do not allow for alteration of statutory provisions which appear unrealistic and not sufficiently protective of the public interest. We must declare the law as the Legislature has written it. The Port of N.Y. Authority v. Weehawken Tp., 14 N.J. 570, 580 (1954). "[T]he Judiciary is not concerned with the good sense of a statute. Policy matters are the exclusive responsibility of the legislative branch of government. A judge, as a private citizen, may express his opinion at the polls * * * [b]ut the issue now before us is wholly one of the power of the [Board] to act, and upon that inquiry a judge would usurp authority if his personal view of policy intruded upon his deliberations." Two Guys from Harrison, Inc. v. Furman, 32 N.J. 199, 229 (1960).

(C).
In view of our determination that the Board is without jurisdiction to order temporary suspension of appellant's license on the presently advanced justification, it becomes unnecessary to discuss at length his allegation that the suspension orders were invalid because marked by procedural *506 deficiencies. Our remarks as to the order of November 16, 1960 are contained in III (A), supra. With respect to the May 11 resolution, appellant's charge is that the decision of the Board was not arrived at after a duly constituted meeting but rather by means of a "telephone conference arrangement," which, it is claimed, is not a proper substitute for face-to-face discussion. An affidavit, submitted at the court's request, by Walter P. McHale, Chief Administrative Officer of the Division of Professional Boards in the Department of Law and Public Safety, indicates that, following due notice, the Board "met" on May 11 by means of a specially arranged closed circuit "telephone conference," and that following group discussion by means of this electronic arrangement, the unanimous vote of the members was recorded with respect to the continuation of Dr. Weiner's suspension. We expressly leave for future determination the issue of whether an administrative body must deliberate in formal face-to-face session, or the extent to which it may utilize electronic devices to reach a decision on a question raised at what is probably best described as a non-public investigatory proceeding. See 73 C.J.S. Public Administrative Bodies and Procedure § 20, pp. 313-314; Davis, Administrative Law (1951), § 85, p. 296.

IV.
At the suggestion of the court, the State Commissioner of Health was joined as a party respondent on this appeal and the principals briefed the question of his authority to prohibit Dr. Weiner, by ex parte order, from administering "parenteral and other drugs and other materials," and, if such authority were found to exist, the issue of whether the restriction should continue only for the duration of the license suspension.
The question has for the present time become moot, however, because of Dr. Weiner's consent, relayed to his attorney and represented to the court at oral argument, to *507 the continuation of such order, if modified in scope, until the outcome of the criminal proceedings. Commissioner Kandle has since agreed to the modification and, by notice of June 19, 1961, his order has been amended to prohibit only "the administration and use of parenteral [administered other than orally] drugs."

V.
The order of the State Board of Medical Examiners temporarily suspending the license of Dr. Albert L. Weiner is hereby reversed and set aside, and the Board is directed to restore said license effective immediately. The order of the State Commissioner of Health, as modified and as consented to by appellant, prohibiting the administration of drugs by injection until the indictment is disposed of, will stand undisturbed.
So ordered.